2002 SD 36

**FIRST NATIONAL BANK OF PHILIP, South Dakota, Plaintiff and Appellee,**

v.

**Doug TEMPLE, Defendant and Appellant,**

and

**Merle Temple, Defendant and Appellee.**

**No. 21811.**

Supreme Court of South Dakota.

Argued Oct. 3, 2001.

Decided March 13, 2002.

---

Ralph Kemnitz, Philip, for plaintiff and appellee.

Thomas W. Stanton and Michael V. Wheeler of Demersseman, Jensen, Rapid City, for defendant and appellant.

Kenneth R. Dewell of Viken, Viken, Pechota, Leach & Dewell, Rapid City, for defendant and appellee.

STEELE, Circuit Judge.

[¶ 1.] Doug Temple appeals from a judgment ordering that First National Bank of Philip held a perfected security interest in and to certain livestock as a result of loan instruments executed by Merle Temple. We affirm.

## FACTS

[¶ 2.] Beginning in 1990, Merle Temple (Merle) obtained loans from First National Bank in Philip, South Dakota (FNB). To secure the loans, he pledged as collateral cattle bearing one or more brands owned by him. FNB perfected a security interest in all the cattle so branded, their products and proceeds, after first determining that no other security interest appeared of record to suggest any prior lien.

[¶ 3.] In 1992 Doug Temple (Doug),[1] Merle's father, delivered thirty head of cattle bearing Doug's brand to Merle. These cattle were to be cared for by Merle. In exchange Merle would be entitled to all calves produced from these thirty head. Merle was also expected to work for Doug from time to time in general ranching activities.

[¶ 4.] In December 1993 Doug purchased twenty heifers which were branded with Merle's brand at Doug's direction. In October 1995 Doug purchased an additional twenty-nine heifers, again branding them with Merle's brand. All cattle were branded at their location of purchase and then delivered to Range Unit # 508, under Merle's control.

[¶ 5.] In his 1996 financial statement, Merle reported that he owned seventy-six cows and ten replacement heifers. This reflected an increase over the thirty-one cows and six replacement heifers reported in the 1995 financial statement. Merle claimed that the twenty head acquired in 1993 and the twenty-nine head acquired in 1995, all branded with his brand, were his cows. FNB understood that Merle was running thirty cows for his father and that Merle received all of the increase.

[¶ 6.] The relationship between Doug and Merle began to deteriorate. In March 1999 Doug removed part of the original thirty cows bearing his brand from Merle's care.

[¶ 7.] In early September 1999 Doug made his first and only contact with FNB, and apprised FNB of his claim of an ownership interest in Merle's cattle. He claimed that the livestock acquired in 1993 and 1995 were to remain his cows. They were only branded with Merle's brand to distinguish the pasture to which they were assigned, despite the fact that Doug already had thirty head branded with his own brand in the same pasture. Shortly thereafter, Doug obtained an ex parte order from the Ogalala Sioux Tribal Court authorizing seizure of forty-nine to fifty head of cattle. These cattle were seized and sold at Belle Fourche Livestock Auction. The proceeds of the sale were paid into escrow and this action for declaratory judgment was brought in circuit court.

## STANDARD OF REVIEW

[¶ 8.] We review the circuit court's findings of fact under the clearly

---

1. Both Doug and Merle are enrolled members of the Ogalala Sioux Indian Tribe and at times relevant resided within the boundaries of the Pine Ridge Indian Reservation.

erroneous standard. *City of Deadwood v. Summit, Inc.*, 2000 SD 29, ¶ 9, 607 N.W.2d 22, 25. "Clear error is shown only when, after a review of all the evidence, 'we are left with a definite and firm conviction that a mistake has been made.'" *Id.* "The trial court's findings of fact are presumed correct and we defer to those findings unless the evidence clearly preponderates against them." *Id.* Conclusions of law are reviewed under a de novo standard, giving no deference to the circuit court's conclusions of law. *Sherburn v. Patterson Farms, Inc.*, 1999 SD 47, ¶ 4, 593 N.W.2d 414, 416.

### ISSUE ONE

[¶ 9.] **Was Doug denied a constitutional or statutory right to a jury trial in this case?**

[¶ 10.] Whether a party to a civil action is entitled to a jury trial has been considered by this Court on a number of occasions. The general rule is:

The right to a jury trial is guaranteed both litigants in Article VI, § 6 of the South Dakota Constitution and SDCL 15–6–38(a), (b). This right, however, does not exist in all civil cases. In cases where the pleadings seek equitable relief or where the legal relief is incidental, a jury trial is a matter for the trial court's discretion. Conversely, when the action is at law, either party has a right to a jury trial.

*First Western Bank, Sturgis v. Livestock Yards*, 466 N.W.2d 853, 856 (S.D.1991) (quoting *Nizielski v. Tvinnereim*, 453 N.W.2d 831, 832–33 (S.D.1990)).[2]

Whether an action is legal or equitable must be determined by the real, meritorious controversy between the parties.

Mere characterizations will be disregarded, and the courts should look beyond the form in which the action is brought. As a matter of practice, the court looks to the ultimate and entire relief sought, as presented by the pleadings, including the complaint, answer, cross-complaint and prayer for relief.

*Arlt v. Langley*, 56 S.D. 79, 88, 227 N.W. 469, 473 (1929)(quoting 2 Bancrofts, *Code Practice and Remedies*, § 1107.)

[¶ 11.] In this case Doug is claiming title and ownership to the cattle. He argues FNB knew or should have known of this interest and, therefore, cannot claim a superior right in the cattle by way of the alleged security interest. This Court will look not only to the complaint, answer, cross-complaint and prayer for relief but also to the real, meritorious controversy between the parties. *Id.* FNB brought this action in the nature of a declaratory judgment action under SDCL ch. 21–24 in order to resolve its rights to the proceeds of the sale of the cattle. Accordingly,

A litigant is not necessarily deprived of a jury trial merely because it is a party to a declaratory judgment action. Although the declaratory judgment procedure largely originated in equity, declaratory relief *per se* is neither legal nor equitable. The fact that a declaratory judgment is sought neither restricts nor enlarges any right to a jury trial that would exist if the issue were to arise in a more traditional kind of action for affirmative relief. To determine whether there is a right to a jury trial in a declaratory judgment action, it is necessary first to determine the nature of the action in which the issue would have arisen absent the declaratory judgment

**2.** It should be noted that the United States Supreme Court has abolished the requirement that a legal claim must not be incidental.

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

procedure. In other words, if there would have been a right to a jury trial on the issue had it arisen in an action other than one for declaratory judgment, then there is a right to a jury trial in the declaratory judgement action; conversely, there is no right to a trial by jury if, absent the declaratory judgment procedure, the issue would have arisen in an equitable proceeding.

*Northgate Homes, Inc. v. City of Dayton,* 126 F.3d 1095, 1098–1099 (8th Cir.1997) (internal citations omitted).

[¶ 12.] In the absence of the declaratory judgment procedure this action would have arisen as an action to foreclose. A complaint seeking foreclosure of a mortgage is unquestionably an equitable action. *Alma Group, L.L.C. v. Weiss,* 2000 SD 108, 616 N.W.2d 96. We adopt the analysis set forth in *Northgate Homes, Inc.* The trial court did not err in denying Doug's demand for a jury trial.[3]

ISSUE TWO

[¶ 13.] **Did the trial court err in failing to dismiss this case based upon the doctrine of comity?**

[¶ 14.] Doug and Merle are enrolled members of the Ogalala Sioux Indian Tribe and reside on the Pine Ridge Indian Reservation. The tribal court issued an ex parte order involving them. Because of these facts Doug contends that the circuit court should have deferred to the tribal court to adjudicate the dispute between the parties under the doctrine of comity.

[¶ 15.] The United States Supreme Court has recognized comity as:

The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations.' Although the phrase has been often criticized, no satisfactory substitute has been suggested.

'Comity,' in the legal sense, is neither a matter of absolute obligation on the one hand, nor of mere courtesy and good will upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Kwongyuen Hangkee Co. v. Starr Fireworks,* 2001 SD 113, ¶ 8, 634 N.W.2d 95, 96 (quoting *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95, 108 (1895)). Pursuant to SDCL 1–1–25:

No order or judgment of a tribal court in the state of South Dakota may be recognized as a matter of comity in the

---

**3.** Doug argues that we should adopt the rule stated in *General Elec. Credit Corp. v. Richman,* 338 N.W.2d 814 (N.D.1983). In that case the North Dakota Supreme Court stated that "If a plaintiff in an action to foreclose a mortgage or other lien brings in a third party, a stranger to the mortgage, the third party is entitled to a jury trial." *Id.* at 818 (citing *First National Bank of Dickinson v. Kling,* 65 N.D. 264, 257 N.W. 631 (N.D.1934)). The statement was dictum to the General Electric decision. In *Kling* the real issue between the parties was found to be one of the title to and ownership of certain horses as well as foreclosure of a chattel mortgage. *Kling* was not decided under Article 9 of the Uniform Commercial Code, and the defendant's right to a jury trial was based upon section 7608 of North Dakota Compiled Laws 1913, which dictated "An action for recovery of personal property must be tried by a jury ..." *Id.* at 634. South Dakota has no similar statute. We find the argument unpersuasive.

state courts of South Dakota, except under the following terms and conditions:

(1) Before a state court may consider recognizing a tribal court order or judgment the party seeking recognition shall establish by clear and convincing evidence that:

(a) The tribal court had jurisdiction over both the subject matter and the parties;

(b) The order or judgment was not fraudulently obtained;

(c) The order or judgment was obtained by a process that assures the requisites of an impartial administration of justice including but not limited to due notice and hearing;

(d) The order or judgment complies with the laws, ordinances and regulations of the jurisdiction from which it was obtained; and

(e) The order or judgment does not contravene the public policy of the state of South Dakota.

(2) If a court is satisfied that all of the foregoing conditions exist, the court may recognize the tribal court order or judgment in any of the following circumstances:

(a) In any child custody or domestic relations case; or

(b) In any case in which the jurisdiction issuing the order or judgment also grants comity to orders and judgments of the South Dakota courts; or

(c) In other cases if exceptional circumstances warrant it; or

(d) Any order required or authorized to be recognized pursuant to 25 U.S.C., § 1911(d) or 25 U.S.C., § 1919.

■■■ [¶ 16.] South Dakota courts will recognize tribal court orders under the principle of comity, *Wells v. Wells,* 451 N.W.2d 402 (S.D.1990), but the party seeking recognition must first establish that the tribal court order complies with SDCL 1-1-25. *Mexican v. Circle Bear,* 370 N.W.2d 737 (S.D.1985). SDCL 1-1-25(1)(d) requires a showing by clear and convincing evidence that "[t]he order or judgment complies with the laws, ordinances and regulations of the jurisdiction from which it was obtained[.]"

[¶ 17.] Doug made no such showing in the course of these proceedings. The trial court stated in its findings of fact that no evidence was proffered and, in fact, SDCL 1-1-25(2) was not even addressed. This does not rise to the standard of clear and convincing evidence.

[¶ 18.] Furthermore, SDCL 1-1-25(1)(c) requires due notice and hearing. FNB was never given the opportunity to protect its security interest when the tribal court ordered the livestock seized from Merle. Accordingly, FNB was not afforded the requisite "due notice and hearing" as required by the statute.

[¶ 19.] Finally, FNB is an innocent bystander to the disputes between Merle and Doug. FNB took all of the necessary steps in order to protect its interests in the livestock. The dispute as to who actually owned the cattle is between Merle and Doug, both enrolled members of the Ogalala Sioux Tribe. FNB is not a party to that dispute. The trial court properly distinguished the ownership claim from the security interest claim at hand.

[¶ 20.] The trial court correctly determined that the case should not be dismissed based on the doctrine of comity.

## ISSUE THREE

[¶ 21.] **Did the trial court err when it concluded that FNB held a valid and perfected security interest in the cattle in question?**

[¶ 22.] To claim a valid, perfected security interest in collateral, the security interest must attach to the collateral. A security interest attaches when (1) there is an agreement that it attach; (2) value has been given by the secured party; and (3) the debtor has rights in the collateral. SDCL 57A–9–203; *First Nat. Bank v. Pleasant Hollow Farm*, 532 N.W.2d 60, 62 (S.D.1995). The issue in this case is whether the debtor had sufficient rights in the collateral enabling the security interest to attach.

[¶ 23.] "The phrase 'rights in collateral' as used in [SDCL 57A–9–203] has no clear definition." *Continental Grain Co. v. Brandenburg*, 1998 SD 118, ¶ 17, 587 N.W.2d 196, 200. The doctrine of derivative rights helps to define and explain this phrase. Essentially, a security interest does not attach to the described asset; it attaches to the debtor's rights in the asset. William H. Lawrence et al., *Understanding Secured Transactions* 88–90 (2000). Furthermore,

> The common conceptualization of property rights as consisting of a bundle of sticks is helpful in understanding when a debtor has sufficient rights in an asset to grant an enforceable Article 9 security interest. Full ownership of an asset includes, *inter alia*, the rights to possess and use the asset. All or some of the owner's rights can be transferred by way of sale, lease, or license. A person with transferable rights can grant an enforceable security interest in those rights. In the full ownership situations, the security interest attaches to the full panoply of rights, ... debtor with only limited rights in an asset can convey no more than the extent of its own interest. The limitations on the debtor's rights also constitute limitations on the interest taken by the secured party and on the interest that can be conveyed to a fore-closure-sale buyer.... A secured party's rights expand as additional parties with rights in the collateral consent to have their rights encumbered.... Even a person who has not actually consented to a security interest may be estopped to deny its effectiveness.... Estoppel can result from either a common-law rule or a statute and is inevitably based on the estopped person's actions in clothing the debtor with indicia of ownership.

*Id.* (internal citations omitted). (*See also Pleasant View Farms, Inc. v. Ness*, 455 N.W.2d 602 (S.D.1990). If the owner of collateral allows another to appear as the owner or to dispose of the collateral, such that a third party is led into dealing with the apparent owner as though he were the actual owner, then the owner will be estopped from asserting that the apparent owner did not have rights in the collateral).

[¶ 24.] This Court addressed the phrase "rights in the collateral" in *Continental Grain*, 1998 SD 118 at ¶ 17, 587 N.W.2d at 200:

> In an Article 9 transaction, the rule is mere possession of the collateral by the debtor is not enough to grant sufficient rights for the security interest to attach. Yet, as with many rules, there are exceptions. This Court has found formal title is not required for a debtor to have sufficient 'rights in the collateral' to allow a security interest to attach. A debtor may have sufficient rights to create a security interest when he does so with an authorization from the actual owner of the collateral. Also, a debtor may have sufficient rights in the collateral if he has something more than 'naked possession.' Essentially, the debtor normally can only convey something once it has something and that something may be less than the full bundle of rights that one may hold in

such property. (internal citations omitted).

"In *Pleasant Hollow*, this Court stated that control over the collateral is the factor that determines the debtor's rights in the collateral, not ownership." *Continental Grain*, 1998 SD 118 at ¶ 18, 587 N.W.2d at 200.

[E]ven if a party retains ownership interest in a piece of collateral, a debtor who retains that collateral is still able to mislead potential creditors by exercising his "rights" of possession and control over the collateral. It is the outward appearance of a *debtor's* rights of ownership and control in the collateral that determines whether attachment of a security interest is effective and not the right of a party who may have title to the collateral.

*Id.* (quoting *First Nat. Bank v. Pleasant Hollow Farm*, 532 N.W.2d at 63.)

[¶ 25.] In the case before us, Merle at all times had every outward appearance of ownership and control of the livestock. The livestock were, at all times, possessed by the debtor and had his healed brand on them. (*See also Continental Grain*, 1998 SD 118 at ¶ 32, 587 N.W.2d at 204, fn. 9 stating that SDCL 40–19–24 provides a registered brand is prima facie evidence of ownership of livestock). He cared for the cattle at his sole expense using his own land, facilities, equipment and feed. He made all decisions relative to culling, selling and care of the livestock. Furthermore, it is undisputed that he signed all documents necessary to secure the collateral for his loans. Doug gave Merle the outward appearance of ownership and control over the cattle. It was under his direction that the cattle were branded with Merle's brand. Doug argues that this was done to distinguish the pasture to which they were assigned. However, Doug's original thirty head, branded with his

brand and which are not part of this controversy, were in the same pasture as the other cattle branded with Merle's brand. These facts compel this Court to conclude that the debtor, Merle, had the necessary rights in the collateral in order for FNB to properly perfect its security interest.

[¶ 26.] Doug argues that FNB knew or should have known that the cattle were his. Doug contends that FNB cannot take a valid security interest in those cattle through Merle if it can be shown that they knew, or should have known, that the cattle were not Merle's. He cites no direct authority to support this proposition. Doug argues that creditors, based upon their own wrongful or negligent conduct, can be estopped from asserting or enforcing an alleged security interest in collateral. *See* 68A Am.Jur.2d, *Secured Transactions*, § 788, at 646–747 (1993); *see also Continental Grain*, 1998 SD 118 at ¶ 32, 587 N.W.2d at 203–204 (creditors were estopped from claiming that debtor did not have sufficient rights in collateral based upon the creditors' "negligent behavior" and "noncompliance with Article 9").

[¶ 27.] We distinguish the facts in *Continental Grain* from those before us today. In that case the creditor "did not arrange for protection under Article 9, until this final transaction came to its attention. By that time it was too late." *Id.*, 1998 SD 118 at ¶ 31, 587 N.W.2d at 203. The negligent behavior is in reference to the creditor continuously taking checks that were returned as non-sufficient funds.

We [find] this practice to be less than reasonable. That [creditor] did not protect itself by using Article 9 or some other means after the first check was returned is negligence. That it did not arrange to protect itself in all other transactions with [debtor] is without justification. *Article 9 was enacted to pro-*

*vide a protective mechanism for businesses like [creditor's].*

*Id.* FNB did everything legally necessary to protect its interest. Doug failed to protect his interest under the law and clothed his son with all indices of ownership. FNB cannot be penalized for Doug's own failures.

[¶ 28.] Under the facts of this case, we conclude that FNB held a valid security interest in the livestock in question and is entitled to the escrowed proceeds of the sale.

[¶ 29.] Accordingly, we affirm the judgment of the trial court.

[¶ 30.] GILBERTSON, Chief Justice, and SABERS, AMUNDSON and KONENKAMP, Justices, concur.

[¶ 31.] STEELE, Circuit Judge, for GORS, Acting Justice.